# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 13, 2024 Session

## QUALITY MOTORS, LLC v. MOTOHAVEN AUTOMOTIVE GROUP, LLC, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-190-19      William T. Ailor, Judge**

_____

### No. E2023-01443-COA-R3-CV

_____

Quality Motors, LLC, a defunct used car dealership owned by Chris Yousif, filed suit in the Circuit Court for Knox County ("the Trial Court") against Ali Hussein Khalil and Motohaven Automotive Group, LLC ("Motohaven"), pursuant to Tenn. Code Ann. § 29-30-101 to -111. Quality Motors claimed that Khalil had converted for his personal benefit fourteen of its cars, four of which had been sold to Motohaven. At the conclusion of Quality Motors' proof at trial, the Trial Court granted Motohaven's motion for directed verdict, which we construe as a motion for involuntary dismissal. At the conclusion of trial, the Trial Court found that Quality Motors had failed to meet its burden of proof against Khalil and entered a judgment dismissing Quality Motors' case. The Trial Court granted Khalil's and Motohaven's respective motions for exemplary damages pursuant to Tenn. Code Ann. § 29-30-110. Quality Motors appealed. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

W. Allen McDonald, Knoxville, Tennessee, for the appellant, Quality Motors, LLC.

Rachel E. Sanders and Carol A. Beeler, Knoxville, Tennessee, for the appellee, Ali Hussein Khalil.

Cathy Honaker Morton, Maryville, Tennessee for the appellee, Motohaven Automotive Group, LLC.

# OPINION

## Background

In August 2017, Quality Motors filed suit to recover personal property and an affidavit by Yousif, its sole owner and chief manager, against Khalil and Motohaven in the Knox County General Sessions Court ("the General Sessions Court"). Quality Motors sought the recovery of fourteen vehicles for which it claimed to be the title owner. The General Sessions Court entered an order stating that Motohaven had four of the vehicles at issue in its possession and permitting Motohaven to sell them and deposit the proceeds with its attorney to be held in trust until further order from the General Sessions Court. In January 2019, the General Sessions Court entered an agreed order transferring the case to the Trial Court due to its complexity.

In November 2019, Quality Motors filed a complaint in the Trial Court, pursuant to Tenn. Code Ann. § 29-30-101 to -111. Quality Motors alleged that while Khalil was working as its employee, he sold fourteen of its vehicles to Motohaven and converted the proceeds of the sale for his own personal use, benefit, and enrichment. Quality Motors alleged that Khalil was liable for conversion, intentional/fraudulent concealment/misrepresentation, and abuse/breach of confidential relationship, given that he had acted without Quality Motors' authority or consent. Quality Motors alleged that Motohaven was liable for conversion. Quality Motors asked the Trial Court to set aside the conveyance of the vehicles to Motohaven and order Khalil to transfer the proceeds from the sales to Quality Motors. Alternatively, Quality Motors requested the Trial Court order Khalil to pay Quality Motors $143,500, the value of the vehicles. Quality Motors also requested an award of punitive damages in the amount of $500,000. In Motohaven's answer, it claimed that it had purchased only four vehicles from Khalil. Khalil's answer denied that he had been working as Quality Motors' agent.

In March 2022, Khalil and Motohaven filed a joint motion to dismiss, arguing that Quality Motors lacked standing and should be judicially estopped from pursuing the action. Khalil and Motohaven alleged that Quality Motors had been administratively dissolved in August 2018 and that Yousif had filed for bankruptcy in April 2019 and failed to disclose his involvement with Quality Motors, this cause of action, and any interest in the vehicles at issue. Quality Motors filed a response, arguing that it could still file and maintain a lawsuit, despite being administratively dissolved, and that Yousif's bankruptcy was irrelevant given that Quality Motors, not Yousif, was the plaintiff. The Trial Court denied Khalil and Motohaven's motion to dismiss.

The case proceeded to trial over a period of several days in April and May of 2023. Yousif testified that he was the sole owner of Quality Motors and that he had financed Quality Motors' purchase of vehicles through a floorplan financing company

called NextGear. Yousif was the sole guarantor of the financing. He testified that Khalil was the manager of Quality Motors.

According to Yousif, Khalil's job duties included buying cars; monitoring the office, records, bills of sales, trade-ins, and cars bought at auction; providing Quality Motors' accountant with all tax documentation; and ensuring that cars were detailed and ready to sell. Yousif testified that Khalil was not a salesman, contradicting his prior deposition testimony that Khalil was a salesman. He further testified that Khalil did not have authority to sell cars without his approval and consent, again contradicting his prior deposition testimony that Khalil did have permission to sell cars. He also acknowledged that Khalil needed a license to buy cars and that the only way for him to buy cars was through Quality Motors. Yousif explained that Khalil and he would set car prices together, using a software called "Frazer." They also used Frazer to input and keep track of bills of sales. Yousif claimed that Khalil was paid commission for cars sold. Yousif testified that he trusted Khalil to manage Quality Motors for him.

Khalil testified that he brought his own car inventory from his previous business, Preferred Leasing, when he joined Quality Motors. Khalil explained: "I brought in the inventory to Quality Motors with me. Half of the stuff were already at Quality Motors before I even went there." When asked why half of his cars were already at Quality Motors' lot, he explained:

A: Sales people needed more cars, they didn't have enough cars on the lot, so they would use my cars to sell, so in order for them to make more money.

Q: And . . . why would you put your cars on Quality Motors lot?

A: Because me and him were friends, just trying to help a friend.

When asked why he closed Preferred Leasing to join Quality Motors, Khalil explained:

Because at that time he had a couple sales people out there and they were, I got to the point where they were using my cars, they didn't have a lot of cars up there. So it was just -- and me and him talked, and he said why don't you, you know, instead of having your own and having my own, why don't you -- I didn't have a lot of cars, I had like probably about 28, 30 cars at that time. And he said we can just, instead of having, you know, two overheads you can just come over here, help me with what I got and you can do your own under one umbrella under his name.

When asked what his arrangement was with Yousif, Khalil explained:

> We really did not have an official arrangement. We didn't have anything, I mean. The understanding was I had my own cars, he has his own cars. I will help him with everything I can through his dealership. I do my own, he does his own, and I just work at, you know, Quality Motors, that's the only thing that he was helping me with, and I was helping him with everything else.

Khalil also testified that he had to work under Quality Motors' name because he no longer had his dealer license after he closed Preferred Leasing.

Quality Motors called Sali Rafuna, another individual involved in the used car business, as a witness. Rafuna testified that he had purchased some cars "through" Khalil and Quality Motors that he would fix and resell because he did not have a dealer license at the time. Rafuna testified that Khalil and Quality Motors would resell these cars on his behalf. According to Rafuna, Khalil and Quality Motors would run the sales through Quality Motors' name. Rafuna affirmed that vehicles were being purchased for both Khalil and himself "under the umbrella" of Quality Motors.

Khalil called Jeremy Taylor, a former Quality Motors employee who quit and joined Motohaven prior to the underlying events of this case, to testify. Taylor testified that it was his understanding that Khalil and Yousif "operated as a, maybe not legally, but through operation as partners in the business." Taylor also affirmed that an individual would need a dealer license to buy cars at auction.

At the conclusion of Quality Motors' proof, Khalil and Motohaven moved for directed verdicts pursuant to Tenn. R. Civ. P. 50, and Motohaven moved for exemplary damages, pursuant to Tenn. Code Ann. § 29-30-110. The Trial Court granted Motohaven's motion, finding:

> Based on all of the evidence presented, argument of counsel, review of the applicable law and the record as a whole, the Court finds that the conduct of the Defendant Ali Khalil (referred to in the style of this case as Khalil Ali Hussein) as to the sale or transfer of any motor vehicles to the Defendant Motohaven Automotive Group, LLC was within the scope of his authority as an agent of the Plaintiff Quality Motors, LLC, that the testimony of Chris Yousif, the sole owner and representative of Quality Motors, LLC, was inconsistent, evasive and contradictory and that there was no evidence of any wrongful conduct or wrongful possession or conversion of any vehicles by the Defendant Motohaven Automotive Group, LLC and that the Defendant Motohaven Automotive Group, LLC's Motion for a Directed Verdict should be granted.

The Trial Court incorporated into its order the transcript of its oral ruling, which included the following additional findings:

> In reviewing the testimony of the witnesses with regard to Motohaven specifically, in the Court's opinion, the testimony of Mr. Yousif is all over the map with regard to Mr. Khalil's authority. In some places he testifies that Mr. Khalil could only sell vehicles with his authority, and then other places he has testified that he had the authority to sell vehicles on his own at times. Additionally, Mr. Yousif stated in his testimony that Mr. Khalil had authority to change information and knew the password in the Frazer system, that there's -- the testimony of Mr. Yousif is that he doesn't know if Motohaven followed the directions of Mr. Khalil with regard to who to pay the proceeds of any sales to. The documents that have been presented with regard to the bills of sale of the different vehicles that have been attached as exhibits in the record here, many of which have no signature on them whatsoever.
>
> Mr. Yousif's testimony, instead of answering the questions, Mr. Yousif evaded the questions, continued to ask the attorneys to ask Mr. Khalil instead of responding to the questions. He stated that his only information was that Mr. Khalil must have done this, as regarding these transactions, because he didn't get paid for the vehicles, but he does not have any bank records to prove that he was paid. He doesn't have any bank records showing that he wasn't paid.

The Trial Court granted Motohaven leave to file an affidavit in support of its motion for exemplary damages. The Trial Court denied Khalil's motion.

On June 14, 2023, after the conclusion of trial, the Trial Court entered a judgment in favor of Khalil. The Trial Court made the following findings of fact:

> The Court observed the Plaintiff's responses to questions. The Plaintiff failed to disclose this cause to the bankruptcy trustee in his personal bankruptcy. The Court made note that the Plaintiff evaded questions throughout his testimony and contradicted his prior testimony as well as his trial testimony during the trial on numerous occasions. The Plaintiff throughout the trial attempted to introduce evidence that has not been produced to the Defendants. He contradicted his prior testimony that he did not have those records. The Court's determination is the Plaintiff was willfully false throughout his testimony.

One of the most telling pieces of evidence for the Court were the bills of sales which misspelled Defendant Ali Khalil's (referred to in the style of the case as Khalil Ali Hussein) name. Presumably, Mr. Khalil would know how to spell his own name and would spell it correctly. This leads the Court to believe that Mr. Khalil did not generate the fraudulent documents. The fact that relevant documents were not turned over during discovery that the Plaintiff later attempted to introduce at trial makes the Court suspicious of the Plaintiff's case.

From all the proof, the Court is of the opinion that the Plaintiff has failed to prove his case by the preponderance of the evidence and, in fact, that the proof preponderates against the Plaintiff.

The Trial Court incorporated into its judgment the transcript of its oral ruling, which included additional findings of fact. The Trial Court made the following findings regarding Khalil's testimony, stating:

The defendant was next called to testify. His testimony was that he came to work for plaintiff because the plaintiff was having difficulties with his business, and he brought somewhere between 22 to 28 cars with him from his business. Because he no longer had a license to purchase vehicles, he had to use Quality Motors' license, and he purchased cars for both himself, Quality Motors and others. Additionally, he testified that the cars he brought with him had to be titled in Quality Motors' because the plaintiff no longer was able to meet his financial obligations, and as such they were put on Quality Motors' floor plan. The defendant appeared calm and did not appear to evade questions when he was examined. As a result, the plaintiff (sic) gives some credibility to him. However, his version of the relationship between himself and Quality Motors and what transpired and what took place calls into question his testimony.

On July 12, 2023, Quality Motors filed a motion to alter or amend the judgment or alternatively for a new trial, pursuant to Tennessee Rules of Civil Procedure 59.04 and 59.07. Quality Motors challenged the Trial Court's finding that Khalil did not create the fraudulent bills of sales based upon the fact that the bills of sales misspelled Khalil's name. If the Trial Court were to grant Quality Motors' motion with respect to Khalil, Quality Motors argued that the Trial Court would also need to grant its motion with respect to Motohaven. A few weeks later, Quality Motors filed an amended motion correcting an error in the original.

Motohaven filed a response, arguing that Quality Motors failed to timely serve Motohaven with its motion. Motohaven claimed that the motion was not served via email until July 31, 2023, more than thirty days after entry of the judgment.

Motohaven filed a motion for exemplary damages, attorney's fees and costs, and discretionary costs, pursuant to Tenn. Code Ann. § 29-30-110 and Tenn. R. Civ. P. 54.04. It also requested that the Trial Court sanction Yousif and require him and his attorneys to compensate Motohaven for costs and damages incurred as a result of their "continued frivolous litigation, abuse of discovery process and court proceedings, and abuse of" Motohaven and its counsel. It asked that Quality Motors be disregarded as a separate corporate entity and that Yousif and his attorneys be held personally liable for Motohaven's damages due to their actions and held in civil contempt. Khalil filed a similar motion.

Quality Motors filed a response to these motions, arguing that Tenn. Code Ann. § 29-30-110 was inapplicable because "this case was not prosecuted for return of personal property." According to Quality Motors, all discovery, pretrial motions, and the trial in this case involved only Quality Motors' claim of conversion, fraudulent concealment/misrepresentation, and abuse/breach of confidential relationship. Quality Motors also contested Khalil's and Motohaven's requests for sanctions.

In October 2023, the Trial Court entered an order denying Quality Motors' motion to alter or amend, or alternatively for a new trial, finding:

> Plaintiff's Motion for New Trial is denied being that the allegations in Plaintiff's Motion for New Trial were pure speculation. Court stated that the testimony at trial was, in part, that multiple people had access to the Fraizer system, and the Court did not rule that Chris Yousif generated the bill of sale cited to in Plaintiff's Motion, but Court in its ruling stated the Court listened to testimony of witnesses, observed their demeanor, determined their credibility and used those factors as part of its ruling. The Court's determination was based greatly on the credibility of witnesses, particularly the credibility of Chris Yousif, and it was clear to the Court that he was not truthful throughout the process, therefore, the Motion for New Trial is denied.

(Paragraph numbering omitted.) The Trial Court granted Khalil and Motohaven their requests for discretionary costs but took their requests for attorney's fees, sanctions, and exemplary damages under advisement.

In October 2023, Quality Motors filed a notice of appeal with this Court. In November 2023, this Court entered a show cause order explaining that the Trial Court's judgment was not final given the outstanding motions for sanctions and exemplary damages.

In January 2024, the Trial Court entered an order addressing the remaining issues. The Trial Court denied Khalil's and Motohaven's requests for sanctions due to their

failure to adhere to the strict requirements of Tennessee Rule of Civil Procedure 11. The Trial Court also declined to hold Quality Motors and its counsel in contempt and to pierce the corporate veil.

The Trial Court, however, rejected Quality Motors' arguments regarding the motions for exemplary damages, pursuant to Tenn. Code Ann. § 29-30-110, concluding:

> First, the statue read in its plain language states, "in the event that the plaintiff fails to prosecute the action after it has been instituted." Here a review of Paragraph 4 of the complaint filed in the Circuit Court reveals that the cause was instituted as a cause of action for recovery of personal property. Plaintiff never filed anything notifying Defendants or the Court that it would not pursue the action based on that claim. The Court was always of the opinion that Plaintiff was pursuing this cause of action. Therefore, this argument fails.

The Trial Court awarded Khalil his attorney's fees, discretionary costs, and court costs. The Trial Court did not award attorney's fees to Motohaven, however, because its attorney failed to sign her affidavit of expenses. Motohaven filed a motion to alter or amend the Trial Court's order, noting that its attorney had previously filed a corrected and signed affidavit. The Trial Court entered an order on March 1, 2024, acknowledging that Motohaven's counsel had indeed filed a signed affidavit and granting it attorney's fees. After the Trial Court's entry of this order, this Court entered an order for this appeal to proceed.

### Discussion

Although not stated exactly as such, Quality Motors raises three issues: (1) whether the Trial Court erred by finding that Quality Motors had not met its burden of proof that Khalil unlawfully converted one or more vehicles; (2) whether the Trial Court erred by dismissing its claim against Motohaven at the close of its proof; and (3) whether the Trial Court erred by awarding Khalil and Motohaven all of their attorney's fees and expenses, pursuant to Tenn. Code Ann. § 29-30-110. Although not designated as a separate issue, Motohaven argues that this Court lacks subject matter jurisdiction, given that Quality Motors did not serve Motohaven with its motion to alter or amend within thirty days of its judgment in favor of Khalil.

We first address the threshold issue raised by Motohaven that this Court lacks subject matter jurisdiction to hear this appeal. Motohaven argues that Quality Motors did not serve it with its motion to alter or amend within thirty days of entry of the judgment as required by Tennessee Rule of Civil Procedure 59.04. Rule 59.04 provides that a "motion to alter or amend a judgment shall be filed and served within thirty (30) days after the entry of the judgment." Quality Motors does not dispute that it served its motion

on Motohaven beyond the thirty-day deadline but instead argues that the Trial Court's June 14, 2023 judgment was not a final judgment and that the final judgment was not entered until March 1, 2024, after the Trial Court addressed Khalil's and Motohaven's motions for sanctions and exemplary damages.

Tennessee Rule of Appellate Procedure 3(a) provides:

> In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right. Except as otherwise permitted in rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties.

This Court does not have subject matter jurisdiction without a final judgment, which is a judgment that leaves "nothing else for the trial court to do." *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997).

In accordance with Rule 3(a), this Court entered a show cause order in November 2023, stating that there was no final judgment in this case given the pending motions for sanctions and exemplary damages. This Court permitted Quality Motors additional time to obtain a final judgment. Upon notification of the Trial Court's March 1, 2024 final judgment adjudicating the motions for sanctions and exemplary damages, this Court permitted this appeal to proceed. Therefore, given that there was no final judgment at the time of either Quality Motors' Rule 59.04 motion or its notice of appeal, we conclude that Quality Motors' untimely service to Motohaven does not deprive this Court of subject matter jurisdiction, and we proceed to consider the merits of this case.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise.[1] Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727

---

[1] Quality Motors argues that the standard of review is de novo with no presumption of correctness given the dearth of the Trial Court's findings. Quality Motors contends that the Trial Court failed to make specific findings on the two core issues in the case: (1) who owned the vehicles at issue and (2) whether Khalil took the vehicles or the proceeds from the sales without consent. Although we agree that the Trial Court did not explicitly address these issues, the Trial Court found that Quality Motors failed to prove his case by a preponderance of the evidence and that the evidence preponderated against it. This finding in conjunction with the Trial Court's credibility determinations are sufficient for us to utilize the standard under Tennessee Rule of Appellate Procedure 13(d).

(Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). This same standard applies to our review of the Trial Court's decision to grant Motohaven's motion for a directed verdict, which we construe as a motion for involuntary dismissal, pursuant to Tennessee Rule of Civil Procedure 41.02. *See Boyer v. Heimermann*, 238 S.W.3d 249, 254 (Tenn. Ct. App. 2007) ("motions for directed verdicts have no place in bench trials"); *Via v. Oehlert*, 347 S.W.3d 224, 228 n.2 (Tenn. Ct. App. 2010) (construing a trial court's judgment granting a party's motion for directed verdict as one granting a Rule 41.02 dismissal, given a directed verdict's inapplicability to a bench trial); *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) ("This court uses the familiar Tenn. R. App. P. 13(d) standard to review a trial court's disposition of a Tenn. R. Civ. P. 41.02(2) motion[.]").

With respect to credibility determinations, the Tennessee Supreme Court has instructed:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, 571 U.S. 894, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

To the extent Quality Motors challenges the Trial Court's award of attorney's fees and costs, our review is abuse of discretion. *See Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 827 (Tenn. Ct. App. 2009) ("The general standard of review applicable to a trial court's decision to award attorney's fees is abuse of discretion."). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an

injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

On appeal, Quality Motors argues that the Trial Court erred in concluding that Quality Motors had failed to prove that Khalil unlawfully converted the vehicles at issue. This Court has previously defined the tort of conversion as follows:

> Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights.

*PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (internal citations omitted).

Quality Motors specifically argues that it sufficiently proved that (1) it owned the fourteen vehicles and (2) Khalil intentionally took the fourteen vehicles without its consent. In doing so, Quality Motors partly relies on Yousif's testimony, despite the Trial Court's emphatic finding that Yousif had been "willfully false throughout his testimony" and assignment of "little to no credibility." Quality Motors does not present clear and convincing evidence to persuade this Court to re-evaluate the Trial Court's assessment of Yousif's credibility. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). In fact, Quality Motors hardly addresses this finding, despite its significance to the Trial Court's decision.

Other than Yousif's testimony, Quality Motors relies heavily on exhibits indicating that these vehicles were titled under Quality Motors' name and financed through Quality Motors' floorplan with NextGear. Quality Motors argues that the numerous exhibits "tell the story" in an apparent effort to sidestep the Trial Court's negative evaluation of Yousif's testimony. However, given the conflicting testimony regarding Yousif's and Khalil's business arrangement, specifically the practice of individuals buying and selling cars under the name and dealer license of Quality Motors, the exhibits relied upon by Quality Motors do not explain the entire story.

Although the vehicles were titled in Quality Motors' name, this Court has previously explained:

Under well-established Tennessee law, the titling of a vehicle does not conclusively determine ownership. Rather, "the intention of the parties, not the certificate of title, determines the ownership of an automobile." Ownership is an issue of fact.

*Brewer v. Brewer*, No. M2010-00768-COA-R3-CV, 2011 WL 532267, at *4 (Tenn. Ct. App. Feb. 14, 2011) (internal citations omitted). The root of the dispute over these fourteen vehicles seems to be Yousif's and Khalil's differing views of Khalil's role at Quality Motors. Yousif testified that he hired Khalil to be the manager of Quality Motors and gave inconsistent statements regarding Khalil's authority to sell cars. As the Trial Court found, Yousif "contradicted his testimony several times about Mr. Khalil's authority to sell . . . cars and attempted several times to explain the contradictions away." Yousif did not present a clear picture of Khalil's role at Quality Motors. Again, Quality Motors does not sufficiently address the Trial Court's credibility finding.

In contrast, Khalil testified that when he started working at Quality Motors, he brought his own inventory of cars from his prior business, Preferred Leasing. When asked why he joined Quality Motors, Khalil testified that he did so after Yousif suggested "we can just, instead of having, you know, two overheads you can just come over here, help me with what I got and you can do your own under one umbrella under his name." Both parties agreed that there was no official arrangement or written contract between the two, but Khalil testified that his understanding was that

> I had my own cars, he has his own cars. I will help him with everything I can through his dealership. I do my own, he does his own, and I just work at, you know, Quality Motors, that's the only thing that he was helping me with, and I was helping him with everything else.

When asked why he had to work under Quality Motors' name, Khalil testified:

> Because in order to -- you have to have a dealership or dealer license to buy and sell. You have to have something. And since I closed my business, I mean once you close your business then you have nothing.

Although the Trial Court questioned Khalil's testimony regarding the nature of his relationship with Quality Motors, the Trial Court assigned some credibility to Khalil, given that he appeared calm and did not evade questions when examined.

Furthermore, Khalil's testimony about buying and selling cars under the dealership license of Quality Motors was supported by Quality Motors' own witness, Sali Rafuna. The Trial Court made the following findings regarding Rafuna's testimony:

Sali Rafuna appeared to be a credible witness. His testimony was that he sold vehicles through Motohaven and Quality Motors because he did not have a dealer's license. This would tend to substantiate the latter testimony of Mr. Khalil, that he sold cars through Quality Motors because he no longer had a license to sell cars after he closed down his business and started working with Quality Motors. Additionally, he testified that plaintiff knew that cars were being purchased through Quality Motors for Mr. Rafuna through Mr. Khalil, again that he had no title -- I'm sorry, that had to be titled in Quality Motors' as Mr. Rafuna did not have a license to purchase vehicles at auction.

Quality Motors does not challenge these findings on appeal.

The Trial Court also relied on the testimony of Jeremy Taylor, finding:

The Court determined that Mr. Taylor was a very credible witness who attempted to answer the questions that were put to him without evading them. He has over 30 years of experience in the car business and is a very knowledgeable individual about this business. His testimony was that he worked for Quality Motors for about six months until such time, as he noticed, there were problems with customers and the floor plan companies and quit. He stated that when the floor plan representatives came by the plaintiff's place of work the plaintiff would hide and the defendant would meet with them, and the defendant did everything that he could to keep the business going. His opinion was that the plaintiff and defendant were partners, based on their interactions and what he observed. He testified that all the salesmen had access to the Frazer system, that anyone could have generated the bills of sale for the vehicles in the system.

Again, Quality Motors does not dispute or even address these findings on appeal.

The Trial Court also considered that Quality Motors never produced "bank records to show when money came into the accounts, what the money was for, where the money came from to purchase vehicles or how the money was applied when it was deposited." The Trial Court accordingly could not determine "if money was paid on vehicles that were purchased or applied somewhere else." Although the Trial Court did not explicitly state who owned the vehicles based upon the evidence presented at trial, the Trial Court's findings clearly demonstrate that it was not convinced that Quality Motors had proven the requisite elements of conversion, including its ownership of the fourteen vehicles.

Ultimately, Quality Motors' appellate briefs focus mostly on what Khalil did with these vehicles and spend very little time establishing Quality Motors' ownership. Without establishing that Quality Motors' ownership was proven at trial, there is little

- 13 -

reason for us to consider Quality Motors' lengthy argument regarding Khalil's disposition of these vehicles. The Trial Court assigned some credibility to Khalil but found that Yousif had been willfully false throughout his testimony. Given that Quality Motors bore the burden of proving that Khalil committed the tort of conversion, we, like the Trial Court, are unable to conclude that Quality Motors presented sufficient evidence to establish Khalil's conversion of these vehicles, particularly given the Trial Court's determination that Yousif essentially had no credibility. Discerning no reversible error, we affirm the Trial Court's judgment in favor of Khalil.

With respect to the Trial Court's dismissal of its claim against Motohaven after its close of proof, Quality Motors presents a skeletal argument, solely referencing Yousif's testimony that Khalil was not authorized to sell cars to Motohaven and have the proceeds wired to his brother in Georgia. Again, the Trial Court assigned little to no credibility to Yousif's testimony, specifically citing his contradictory testimony about Khalil's authority to act without his consent. As stated by the Trial Court, its "determination was based greatly on the credibility of witnesses . . . ." We accordingly find that Quality Motors' argument is unconvincing, particularly given that Quality Motors does not present clear and convincing evidence to counter the Trial Court's credibility finding. We otherwise affirm the Trial Court's judgment granting Motohaven's motion for involuntary dismissal, particularly due to the fact that we affirm the Trial Court's judgment in favor of Khalil. Without a successful claim for conversion against Khalil, Quality Motors has no successful claim against Motohaven as the recipient of the allegedly stolen cars.

Lastly, Quality Motors argues that the Trial Court erred by awarding Khalil and Motohaven exemplary damages, pursuant to Tenn. Code Ann. § 29-30-110, which provides:

> The court may, in proper cases, give exemplary damages, including reasonable attorneys fees, in favor of the defendant for the plaintiff's wrongful suing out of this possessory action or in the event that the plaintiff fails to prosecute the action after it has been instituted.

Quality Motors first simply asserts that "the case was not prosecuted for return of personal property after it was transferred from General Sessions Court to Circuit Court." A review of Quality Motors' complaint, however, reveals that Quality Motors filed its action "pursuant to Tenn. Code Ann. § 29-30-101 to Tenn. Code Ann. § 29-30-111, and specifically Tenn. Code Ann. § 29-30-106." In its prayer for relief, Quality Motors requested that the Trial Court set aside the conveyances of the fourteen vehicles at issue. The Trial Court found: "Plaintiff never filed anything notifying Defendants or the Court that it would not pursue the action based on that claim. The Court was always of the opinion that Plaintiff was pursuing this cause of action." We accordingly reject this argument.

Quality Motors next argues that exemplary damages are synonymous with punitive damages, requiring a showing of fraud, malice, gross negligence, oppression or similar willful misconduct. Quality Motors states that it had a good faith basis for its claim based upon the titles to the vehicles indicating Quality Motors as owner. The Trial Court rejected Quality Motors' argument, finding that although the titles showed Quality Motors as owner of the vehicles,

> this Court also found that based on the proof and the Plaintiff's equivocation as to Defendant Khali's authority to buy and sell vehicles in Plaintiff's name, the Plaintiff having been found to have essentially no credibility and Kahil's testimony as he did not have a license anymore since he closed his business and started working with Plaintiff and the fact that Plaintiff knew Defendant, Khalil, was buying cars in Plaintiff's name and selling cars and had to title them in Plaintiff's name.

The Trial Court's rejection of Quality Motors' good faith basis argument again relies heavily upon Yousif's lack of credibility, which Quality Motors does not meaningfully dispute on appeal.

Quality Motors also argues that even if an award of attorney's fees and costs under the statute were available to Khalil and Motohaven, they could be awarded only "for fees attributable to defending the claim for possession of specific personal property – not the defense costs for the conversion and other claims." Quality Motors cites *Beaty v. McGraw*, 15 S.W.3d 819 (Tenn. Ct. App. 1998), in which this Court found that, although the defendants "might have been entitled to attorney's fees for their successful action for wrongful possession, they were not entitled to attorney's fees for unsuccessfully defending against [the plaintiff's] breach of contract claim." *Id.* at 831. The Trial Court addressed this argument in its order granting Motohaven's motion to alter or amend, finding: "This case has always proceeded as an action to recover[] personal property and the other claims cannot be separated out from these claims and Defendants are not seeking damages for defending any other claims delineated by the Plaintiff."

Quality Motors' counsel acknowledged in closing argument that the "only issue is who owned the vehicles," and based upon our review of the record, we agree. Therefore, Khalil's and Motohaven's costs of defending the recovery of personal property claim are inseparable from their costs of defending the conversion and other claims, given that all these claims ultimately boiled down to a dispute over who owned the vehicles. Based upon our review, we discern no reversible error in the Trial Court's award of attorney's fees and costs to Khalil and Motohaven.

## Conclusion

For the foregoing reasons, we affirm the Trial Court's judgments in favor of Ali Hussein Khalil and Motohaven Automotive Group, LLC, and its awards of attorney's fees and costs, pursuant to Tenn. Code Ann. § 29-30-110. We remand for further proceedings consistent with this Opinion, and collection of costs below. Costs of the appeal are assessed against the appellant, Quality Motors, LLC.

_____
D. MICHAEL SWINEY, CHIEF JUDGE